Good afternoon, Robert Spence here on behalf of the appellant in the appeal from the district court, Western District of Tennessee in Doe v. City of Memphis. The issue central to both of the issues that are on appeal is whether or not the plaintiffs were provided with a meaningful opportunity for a discovery. That is the issue that undergirds both the order granting summary judgment and the order granting the defendant's motion to scrap class. Mr. Spence, could I ask you a preliminary question just so I have the correct assessment of the landscape here? If we were to affirm the grant of summary judgment as to, I think it's Doe 2, am I right that that then moots the question of certification of the class? We don't have to get to that? That is correct. So we only get to that if we reverse on your abuse of discretion on discovery question? That is correct. Thank you. Just a few background facts. This case was filed in 2013 as a class consisting of female sexual assault victims who had submitted biological evidence and this evidence was stored in sexual assault kits. I refer to those as SAKs. And those kits were then transported to the City of Memphis for testing and they were not tested. In November of 2013, the police director for the City of Memphis admitted that at that time the City of Memphis had in storage roughly 15,000 SAKs that had not been tested. Following that pronouncement, this lawsuit was filed in December of that year and the case started. It is important to note that one of the first things that the parties did after the case was filed was enter into a complex scheduling order that divided the case into two phases. Phase one was a class certification phase and phase two was a liability and damage phase. That complex scheduling order was entered in May of 2014. Important because whether or not you are deleterious is important. One of the issues is important to whether or not you have had a meaningful opportunity for discovery. Within days of the entry of that particular complex scheduling order, the appellants filed discovery. And the appellants filed discovery several times during the pendency of the case but it wasn't until roughly 67 days later after the defendant had failed to respond to discovery that the plaintiff filed a motion to compel. So there had been no response to discovery, the plaintiff filed a motion to compel. And was this discovery concerning phase one only or was it also on liability? Phase one only. Phase one only. By agreement of the parties and entry of the order by the court. The motion to compel was filed on August 21, 2014. That motion to compel was ultimately granted by the magistrate judge on January 5, 2015. The parties took along further with our written discovery window ending in February. So we filed discovery, we had to file a motion to compel, we got no response whatsoever, the magistrate judge gets involved in January, the discovery window ends in February. The discovery what? Window. The written discovery window ends for phase one. In that order. In the complex order. Right, it ends in February. On February 4th, the plaintiff, the defendant files discovery responses. Discovery responses that it, when it files them, admits are incomplete and deficient. Over the next literally 11 months, the parties are in and out of court where either the magistrate judge or the district judge enters orders ordering the defendant to properly respond on two or three occasions and the defendant admits in open court on at least four occasions in that window of time that the discovery that it has provided to the plaintiff is incomplete and deficient. Mr. Spence, I don't think anybody denies or doubts reading this that you asked for a lot of things you didn't get and you asked for discovery over a longer period than you got, but could you explain why the five years of discovery that you did get is not adequate? Well, I didn't get five years of discovery. What I received from the defendant was a spreadsheet that allegedly contained five years worth of data. That's what I received from the defendant. I didn't receive the investigative files for these five years of SAKs. I received a spreadsheet identifying certain data points for this five year time period. It's important to note that when I received that spreadsheet, the legend that it had embossed on it and that came with the discovery because it told me a couple of things. The defendant told me that this data, we are not saying it is accurate. So the data on the spreadsheet, we are not telling you it is accurate. In fact, the only way to verify the accuracy is to review the investigative files. So I have five years worth of data on a spreadsheet that the defendant tells me it will not verify it's even accurate. I couldn't use it for summary judgment. I couldn't use it for a 1006 summary. It was of no value to me. You got that in December of 2000? I got that in a couple of phases. I got that in February of 2015. I got another spreadsheet in January of 2016. And then the final one after they filed for summary judgment in February of 2016. So over the course of 12 months, I received three different sets of spreadsheets. You got the first one in January of 2000? February of 2015. And then at that point, did you say, hey, this is the problem, there is no underlying information and they are disclaiming the accuracy of this? Well, not in that sense, Judge. Because the defendant admitted it was incomplete and deficient. So it wasn't the usual discovery dispute where a party receives incomplete and deficient information and then has to pound the table to the court to get responsive information. The way this flowed out, the defendant admitted. What did you think you were going to get? Ultimately? Yeah. The investigative files. The investigative files were what I thought I was entitled to. I had requested those. I thought I would ultimately get them. After the summaries? I mean, when they gave you the first summaries in February, the understanding was that you were going to get more summaries or what? I don't know what the understanding was. All the defendant said was the discovery we have provided to is incomplete and deficient. But between February and December, there was more going on with the court and the magistrate judge, right? We were in and out of court. What did you, what was the understanding that you both had as to what they were ultimately going to be giving you? Complete responses to my discovery, which included the source documents. The spreadsheets are of no value to me. They were of no value to me. You know, the spreadsheets were, as I understand, were developed from the investigative files. That's what is claimed here. And the city claims it expended considerable resources and sums of money to take some of the investigative files and prepare the spreadsheets. But you would have liked to have gotten the investigative files themselves. And if you had gotten those, were you prepared to expend the money and the resources to go through all those investigative files and sift out the data that would be of use to you? Or how was that going to be paid for? Did you have the resources to do that? Or what were your plans? Yes. My plan was to review each one of these investigative files and call from these investigative files the data that I needed to prosecute my case. I did not need the city to do a spreadsheet for me. Was that the 15,500 files? Is that how many? That's how many files allegedly are in the city's possession that demonstrate untested essay case. And you were going to go through all those 15,000? All 15,000 files. Is that 15 for the last five years? No, 15 for a window that's from the 80s through 2014. And so for the last five years, what was there? It was probably 2,000 or 3,000 files. I mean, so obviously the more you creep up to 2,000, 2001, 2002, the amount of files to call through becomes smaller. But at no time did I need the city to pluck from... Did you tell the judge that? Like, I don't know why they're spending this time because what I really need is the underlying data. Well, no, we didn't really know what they were doing. Because if you follow the timeline, we got the first spreadsheet in February of 2015. Then we got, for the next nine months, we admit it's incomplete and deficient. We're going to respond completely. And you thought you'd get the underlying file? Right. Then January 16 hits, we get another spreadsheet. They then file for summary judgment. And then post-summary judgment and motion to spread class, we get a third spreadsheet. What do you think is going to be in one or more of these investigative files that's not shown by the spreadsheet? That would be speculation. But I think that there will be evidence of a common mode of dealing with these SAKs governed by the government. That's what I think I'm going to find in these files. If something is governed by the government, you already have the policies and the procedures that they said they followed. They did give you that. Right, right. So if you say, well, the policy to discriminate isn't written down in a policy, it's going to be embodied in the investigative files. Just give me a hint what you think that might be. Is it going to be an email? Is it going to be passage of time? What is it going to be that demonstrates this? It's going to be probably, and we didn't get emails, but it is probably going to be a pattern of conduct driven by a common mode of discretion exercised by the government. Just give me one thing, one tangible thing that's in the investigative file that you weren't able to look at that you think or hope will demonstrate that. That the city is not willing to expend the funds to pay for the testing. But how are you going to find that in the investigative file? Is there going to be a piece of paper that says too expensive or we don't have the money or not justified? Just give me a clue here. It may very well be. Do you have any idea, do you have any basis to say there will be a piece of paper in these files that will corroborate your theory? And if so, what pieces of paper would they be? Well, the piece of paper would be the narrative from the officers of which there may be evidence of discrimination against women. So there are narratives that I would read. There may be issues related to the city being unwilling to expend the funds to test the SAKs. But without the files, I'm just totally in the dark. I'm totally in the dark and trying to assess what I might locate in a file that has been withheld from me. The bottom line is you don't really have any idea what's in these files. I think, well, I surmise what I think is in the files. That would be helpful to me. But could I raise my right hand and tell you what's in these files? No, because I have not been able to see them. Do I understand correctly that one of the questions is something along the lines of why wasn't it tested? And that on that spreadsheet, you're given a series of answers that have been characterized by the defendant. So it might be too much time or victim didn't cooperate. Or it could be any number of things that they've characterized as the reason why it wasn't tested. Or is this not true? Well, with respect to 25 sampling files, that's what the city did. The city, in their motion to strike class, identified 25 files that they told the district court provided evidence of reasons unrelated to gender as to why the kit was not tested. Well, those 25 files were withheld from the plaintiff. We never saw them. But the defendant used those files to procure the motion to strike class by convincing the district court. You were asked to basically accept their characterization of their files. Absolutely. Okay. And then, do I understand, the motion was on liability, right? The motion for summary judgment was on liability. And I'm a little confused about the agreement that it was going to be bifurcated into class discovery and then liability and damages. So when did the discovery transform into potential liability discovery? Well, the first phase of discovery was class discovery, but also merit-based discovery. So to the extent there were some issues that went to whether or not this was a proper class, this was a proper class. And that was proper for discovery because it's merit-based. So it was class discovery and merit-based issues was in the first phase of the discovery. All right. Your time is expired. You'll have your rebuttal. Thank you very much. I appreciate it. Good afternoon. May it please the court. My name is Robert Myers, and I represent the city of Memphis. So I'd like to kind of turn to the first question that was asked and remind the panel that right now, this is a single plaintiff case. So the first decision the court has to make is whether the grant for summary judgment was proper or not. Before we even get to whether there's going to be any class with respect to this particular case. Well, the class allegations don't appeal as well as this one plaintiff, correct? Correct. And so... But it's certainly possible that if there's a discriminatory policy or plan here that adversely impacted the one plaintiff, that can be demonstrated by looking at other similarly situated women, right? It could be. So you can't really say, well, he's only entitled to look at the file for this one plaintiff, which I understand he did get, right? Correct. Correct. And I was going to point out, when you're looking at Jane Doe, number two, who we're really focused on, he got her file, and yet when they were opposing summary judgment and they said they had no meaningful discovery, they didn't point to anything in the file that they wanted further discovery on. So we know that there's no statement in the file of discriminatory intent, there's no statement in the file in there about cost, or Mr. Spence, by his own admission, would have asked for that information. Are you referring to just the file on the single plaintiff at this point? Yes, sir. I'll talk about the others in a minute. I'm kind of baffled as to when this is unfolding. Why was it seemingly 15,000 files or none? I just can't believe that at some point somebody didn't talk about sampling these files, or looking at a smaller subset determined in some way, and let the results of that determine whether you expanded. That would have been very helpful. It just wasn't ever really addressed. He didn't ask, and you didn't propose it. Correct. What happened is we got behind, the city did, and we were scrambling to catch up. The spreadsheets were designed to answer interrogatory questions that we were under an order, based on the motion of COMPEL, to respond to. We had objected to the breadth of the discovery, the 25 years, and the magistrate judge had called it down to 1987, up to June of 2014. Mr. Spence and I threw an agreement because some of those files weren't computerized. Let me start at 2000 and move forward to 2005, where the district court ultimately closed down the discovery. The spreadsheets were designed to answer specific questions that were asking interrogatories. It wasn't anything that I designed, only in the aspect that there was no easy way to get it. We had to create a database. We had to then figure out how we were going to query the database, what tools we were going to use. We ultimately hired 11 lawyers to go into the live police database under police supervision. Has there been any question about whether you did fully and completely answer the interrogatories that you said spelled out these categories that were the framework for the spreadsheet? No, sir. So it's just, again, whether there's something else that the investigative file might show that wasn't revealed by the categories they asked you about. Is that a fair statement? Yes, sir. Have you seen anything in what you did produce that would corroborate this suspicion that the plaintiff has that the reason for not testing these wasn't benign? I have not. In fact, it's the opposite, which is what motivated me to begin to move for summary judgment and move to strike the class allegations. When the plaintiff refers to 25 files, that's not really accurate. There were 25 specific points that we culled through that seemed to reflect the majority of the reasons why an SAK might not have been tested. So there were many more than 25 files that would have shown some of those things. So, for example, somebody recanted. Well, there's more in that five-year period. There's more than one file in which somebody recanted their allegation of rape. And they may have done that for a whole variety of reasons. And we tried to faithfully capture what was written in the file itself. It's not the defendant's characterization. It's our effort to provide the factual basis that came right out of the file. Just out of curiosity, it seems like it would have been a lot faster and cheaper to just turn over the files than you doing this exhaustive data mining of the files. We couldn't turn them over because they all exist in electronic form. Moreover, they're all police files. They're all in a live database. There's some access issues with regard to letting non-police personnel have unfettered access to these files because that was the only way to get in. These are native files. These are native files. And we undertook this task under police supervision. And, of course, the court supervised us as well. The court what? Supervised us. Judge Folks was very keen on us getting through discovery and getting this discovery to Mr. Spence. I thought Mr. Spence wanted this and valued this information. It was their discovery request. It wasn't anything that I pulled out myself one way or the other. But did the plaintiff ask for the files? Not that I can recall, no. Never? That's correct. I'm sorry. Did you also provide information on other crime victims where there was? Yes, yes. That was part of the process. Their interrogatories wanted a set of information for sexual assault victims and they wanted an identical set of information for violent felonies. I spoke to Mr. Spence. We agreed on what definition violent felony would have so that we could put this in the spreadsheet. And so the spreadsheets reflect a review of a total of 15,000 some odd files, about half of which were violent felonies and about half of which were sexual assaults for the period 2001 through 2005, which is the two years, the year of and the two years after Jane Doe II's sexual assault occurred in 2003. And you're saying that that was 15,000 files? Yes. Just for those five years? Yes. So when you say he didn't ask for the files themselves, would that also be true that he didn't ask for them in his Rule 56D affidavit when he was then unhappy with what you had turned up in your spreadsheet? I don't... He may have asked for them. I just don't remember. There was a very long list of items in his... That's fair. If you don't remember, that's fair. Well, if the files were not asked for, what was asked for in terms of how the discovery request was worded? Well, it really wanted to know who the individuals were, names. It wanted to know what the crimes were, so you had sexual assaults or other violent felonies. It wanted to know whether there was DNA evidence that was available. It wanted to know whether that DNA evidence was gathered. It then wanted to know whether that DNA evidence was tested. There was a time period question in there, whether the DNA was submitted within 96 hours or not. Now, were these requests for documents that would show that information or were these in the form of interrogatories? They were in the form of interrogatories. Well, it sounds like you're saying he never asked for the this discovery dispute developed. I don't believe that Plaintiffs asked for these files until we were in front of Judge Foulkes when Mr. Spence announced that the spreadsheets were useless, which was not... And how far into the two years of discovery was that? That was about two and a half years in. And are you saying you had essentially agreed to pull out the data points from the files that constituted the spreadsheet? Yes, because I was trying to answer these specific interrogatories that were asking for very detailed information. And we were trying to do so in the manner in which we could give complete answers to those specific questions. Again, as part of the process, I provided Mr. Spence a sample of 50 and said, this is what we've done. This is how it's going to look. These are the questions, the headings on top of these sheets that we're answering in an attempt to answer your questions. Before I launch on this massive project, is this going to work? And the answer was yes. And when was this? This was at the very beginning when we were ginning up to answer these questions. Was this part of the February incomplete spreadsheet? Was it before that? It would have been before I produced the very first one. So the spreadsheet is about 7,200 pages long or something like that, right? Correct. And you're saying that he signed off on the format of that spreadsheet before you actually undertook the effort? Correct. And will we find that in the records? I hope so. Where? You can tell by my answer, I don't know. Anything further? On the liability, do you... One of the other things to keep in mind, and sometimes we forget this, is one, is the three people who ultimately became named plaintiffs in this case all had their kids tested. And they were all tested at various times. One three days after a sexual assault, one three months after a sexual assault, and one many years, many years later. Well, does that count if it's years after? It just depends on the rationale. You can look at the file and determine whether there was a rationale or not. But specifically, there's no evidence that the rationale was because of sex. So the concept, here you've got a claim where you're saying we're not testing because of sex. The only named plaintiffs have all had their kids tested. Then the allegation is, well, maybe the timing is hinky. Well, the timing is different for all three. So it's not their sex that's making up the difference for the timing. It must be some other reason. Right, but if there's... That's why you want the discovery, to see if there's a pattern of treating these types of kids differently from kids, other types of assaults. But what are you now measuring it against? It what? What are you now measuring it against? The allegation is that these kids weren't tested because these are women. Well, all the plaintiffs are women. There would be thousands more kids that would show up in the data that were women whose kids were tested. There would be others that weren't tested. There would be legitimate, non-discriminatory reasons for those not being tested. There would probably be some in which it was unclear as to why they weren't tested. But given the totality of all that information, you've got women whose kids were tested, women whose kids were tested at different times, women whose kids weren't tested for legitimate reasons, women whose kids weren't tested, maybe we can't tell why. You're not going to be able to extrapolate that last group back to because of sex when all of the others had theirs tested. This case really can't be a because of sex kind of case. Well, we don't really know. If the evidence shows that the police department was diligent in testing all DNA evidence of all offenses except for these kids, then the fact that maybe 10% were tested could be significant. Then why in the five years? You have to think that five years would be a large enough piece of time, period of time within which to come up with some statistical analysis. If you have all that information, if he got it in December and then the motion is in January or if... I don't know. Your spreadsheet did compare the testing of these rape kits with other crimes, violent felonies for which there was some sort of similar evidence. And you used the same data points for that category as you did for this category, right? And did it show a difference? No, sir. Not to my mind. And certainly they had an opportunity to run whatever statistical analysis they wanted on it and they didn't come forward with any. So if you were remiss on testing these kits, you were similarly remiss in testing all the other DNA evidence, at least arguably, right? Correct. If you got it right, you got it right for both. If you got it wrong, you got it wrong for both. I have 13 whole seconds left. Well, you're not required to take them. I will exit. Thank you, Your Honor. Thank you very much. I don't hear a rebuttal. Just a quick couple of points. Where do we find your request for these investigative files? Two places. Two places. Request for production documents number 18 and 19 and in the Rule 56D affidavit paragraphs 5 and 6. There's no question in this record that we requested these investigative files. There's been no question in this record that the city did not provide them. 56D came along after about two years of discovery, right? Right. When were these requests made that you said I think were requests to produce 18 and 19? When did they occur? Seven days after the entry of the complex scheduling order in May of 2014. They were unresponded to for well over two years. Did you ever then file a motion to compel when you didn't get the files themselves? Yes, and the motion was granted. The city then responded and admitted our responses are deficient. We will keep trying. They just kept trying and trying over the course of a year and then filed summary judgment. We don't know whether that deficiency related to their inability to produce these data points that resulted in the spreadsheet or whether the deficiency resulted back not producing the files themselves. You can't tell from that, right? Well, I guess I can tell because I know what I didn't get. I know what I did not have. So again, then, do we find a motion to compel someplace that says you gave us all these data points to answer the interrogatories, that's fine and good, but you didn't give us the files themselves that we requested in the motion to produce? No, because the final spreadsheet we received was after the motion. So the first opportunity I had was the 56F. You said you never wanted a spreadsheet. He says you two agreed on the data points in the spreadsheet. He says you didn't ask for the files. You say you did ask for the files. There's a record of me asking for the files. It's a request for production documents 18 and 19. I filed a rule 56F or D affidavit, so that is in this record. Was there an agreement regarding this spreadsheet? Before he did it, was there some agreement that that would be satisfactory? Was there any agreement? No. The only agreement about the spreadsheet was Mr. Spence, we're going to provide some data in a spreadsheet. Here are some data points. Is that okay with you? Well, sure, if you want to do that. But I had the spreadsheets and most of it is blank. But what doesn't make sense to me still from that is that I understand the request to produce, that you want the file, but you also had interrogatories that asked specific questions. He says that the fields on the spreadsheet corresponded to the specific questions in the interrogatories. Is that right or wrong? In part, yes. In part, yes. Okay, so he also says that you two talked about how he would construct the spreadsheet in order to answer the interrogatories. Is that correct? That is not correct. Never had that discussion? We talked about him saying, I'm going to provide you some data in a spreadsheet with these data points. I'm getting started. Is that okay, Robert? Yes, that's okay, Robert. Is there any dispute about whether these data points did correspond to the specific requests you made in the interrogatories as opposed to the request to produce? Yes, because if you had the spreadsheet, you would know it's mostly empty. It's mostly empty. The fact that it has a column with headings on it, but the data is empty. I'm asking you about the columns. Do the columns accurately correspond to the data you requested in the interrogatories, whether they're blank or not? I would have to say, Judge, for the most part, yes. Okay, thank you. For the most part, yes. And when you got an answer in February that was admittedly inadequate, and then you got the next in December. No, I got the next in January of the following year. Okay, so what, along with the motion for summary judgment, right? Right. When you got those answers, was there a discussion with the court about the adequacy of the answers or anything? No, because the defendant admitted they were incomplete and deficient. When? Always. Always, from February 15 through the last time we had a status conference with the court, they admitted. When was that? That was December of 2015. So that entire time period, the defendant is admitting what we have provided you is incomplete and deficient. Then we rolled... Yes, then we rolled to the next year, and they filed for summary judgment, and the judge studies discovery. When you say the next year, do you mean January? Yes. Or do you mean a year later? I mean January 2016, we're in a status conference in front of the district judge in December of 2015. The city says our discovery that we've is incomplete and deficient, and we need until May. Yes, absolutely. Can you tell me where? It's cited in my brief. It's cited in my brief, and what they said was we need until May 2016 to even possibly fully respond. Well, they didn't file a motion the next month for summary judgment. I mean, so... While all this was going on, you were being patient and not filing motions to compel. I was... Why didn't you file more timely motions to compel? I was being patient because the court was overseeing it. We were having a status conference every three or four months where they would come and say, Your Honor, we've been trying. It's incomplete and deficient. And so in light of the fact that the district court was overseeing this dispute, I didn't feel that I needed to file a motion to compel when the defendant is admitting our answers are incomplete and deficient. The district judge is ordering them to respond to a discovery. What is the point of filing a motion to compel in that environment was my thought at the time. So is it basically not getting the because on the interrogatories, their source information is the files, right? I don't know that. I never saw the files. And because the spreadsheet says the information is unreliable, I can't even rely on the information in the spreadsheet. What about depositions? None were taken because we never identified any of the officers. They were in the files. We never got. So the names of the officers who actually were involved in these investigations, we never got them because we never got the files. And they're not on the spreadsheet? They're not on the spreadsheets. And did you ask for each one? I asked for the investigated files and from that I would have learned. But it wasn't one of the interrogatories? It was not one of the interrogatories. Which officers investigated each one of the S.A.K.'s? My time is up. I appreciate the extra time to discuss it with you. Thank you. Alright. Thank you for pointing that out even though it's not within the parameters of your time. No problem. The case is submitted. As soon as the table is clear the next case may be called.